1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

## SOUTHERN DISTRICT OF CALIFORNIA

10

11  BRADLEY VAN PATTEN, an individual,          CASE NO. 12cv1614-LAB (MDD)
    on behalf of himself and all others
12  similarly situated,                          **ORDER ON CLASS
                                                 CERTIFICATION**
13                                   Plaintiff,
                vs.
14

15  VERTICAL FITNESS GROUP, LLC, etc.,

16                                   Defendant.

17

18        Van Patten accuses Vertical Fitness of sending unsolicited text messages to his cell

19  phone in violation of the federal and state law.  His original complaint, which was filed on

20  June 28, 2012, alleged that Vertical Fitness sent just one unlawful text.  He subsequently

21  filed a first amended complaint, with the Court's leave, alleging that Vertical Fitness and

22  Defendant Advecor actually sent three unlawful texts.  Now before the Court is Van Patten's

23  motion for class certification.[1]  The motion is fully and perhaps overly briefed; both Vertical

24  Fitness and Advecor have filed extensive opposition briefs, and Van Patten has filed a reply

25  brief addressing each.

26

27  ─────────────────

28        [1] Van Patten actually filed his class certification motion before his first amended
    complaint, but the Court will obviously take Van Patten's first amended complaint to be the
    operative complaint here.

## I.      Factual Allegations

Van Patten joined a Gold's Gym in Green Bay, Wisconsin on or around March 21, 2009.  His membership agreement, which a gym manager filled out for him to sign, contained his phone number.  Van Patten didn't stay a Gold's member for long; he cancelled his membership within a three-day trial period, and apparently without even setting foot in the gym after he joined.  Later—the timing isn't exactly clear—Van Patten moved to San Diego and the Gold's Gym he had joined in Green Bay became an Xperience Fitness operated by Vertical Fitness.  (Vertical Fitness Group, LLC had operated the Gold's Gym as a franchise, and around May 1, 2012 it de-identified with Gold's.)

The texts at issue in this case were sent on May 14 and June 25, 2012, and were virtually identical.  Two texts were sent to *former* Gold's members (about 30,000 in number, allegedly), and announced that Gold's was now Xperience Fitness, that members could come back for a low monthly fee, and that they could visit a gym website for a chance to win a Nissan Xterra.  Van Patten received both texts.  A third text was sent on June 25, 2012 to *current* Xperience members (allegedly about 50,000 in number), urging them to refer their friends.

Van Patten insists that when he joined Gold's and signed the membership agreement, he wasn't asked if he wanted to receive promotional texts, nor was he given the option of opting out of receiving them.  This is largely corroborated by the deposition testimony of the gym manager who helped Van Patten join.  She said it wasn't the gym's practice to ask members if they minded being contacted, but that if a member specifically asked not to be contacted that would be noted:

> Q: When Mr. Van Patten listed his phone number, did you ask him if he had any limitations on how he would be contacted through his phone number?
>
> A: No.
>
> Q: Was it your typical practice to ever ask prospective members whether they had any limitations, restrictions, or wishes with regarding the use of their phone numbers?
>
> A: No.

> Q: Are you aware of any of your colleagues such as your program coordinators ever asking any prospective members whether they had any limitations, restrictions, or wishes regarding the use of their phone numbers?
>
> A: No.
>
> Q: Did you or any of your colleagues such as the program coordinators ever provide members the option not to be contacted via telephone?
>
> A: If they requested not to be contacted, that would be noted. (Berggren Dep. at 95:5–24. *See also id.* at 85:24–86:4, 87:22–88:3, 96:14–97:9.)

In a deposition, Vertical Fitness CFO Jon Barton was unequivocal that, in his eyes, when members provided a phone number they were expressly consenting to being contacted, even after their membership ended, for any reason specific to Vertical Fitness. (Barton Dep. at 72:3–77:23.)

## II.   Claims At Issue

Because it is *claims* that the Court is being asked to certify for class treatment, it makes sense to first achieve some clarity on the elements of Van Patten's claims are. He asserts three: (1) a violation of the federal Telephone Consumer Protection Act, 47 U.S.C. § 227; (2) a violation of California Business and Professions Code § 17538.41; and (3) a violation of California Business and Professions Code § 17200.

The TCPA makes it unlawful to make any call using an automatic dialing system to any cellular telephone number, unless the call is made for emergency purposes *or* with the recipient's consent. 47 U.S.C. § 227(b)(1)(A)(iii). *See also Meyer v. Recovery Assocs., LLC*, 707 F.3d 1036, 1043 (9th Cir. 2012) ("The three elements of a TCPA claim are: (1) the defendant called a cellular telephone number; (2) using an automatic telephone dialing system; (3) without the recipient's prior express consent."). The only ambiguity in this, at least as far as this case is concerned, is the meaning of "express consent," and there's a substantive debate to be had about that. At the same time, that debate cuts straight to the merits of Van Patten's case and doesn't need to cloud the class certification analysis. Either providing a phone number on a membership agreement is express consent to being

1  contacted with a membership promotion, or it's not.  *See, e.g.*, *Emanuel v. Los Angeles*

2  *Lakers, Inc.*, 2013 WL 1719035 (C.D. Cal. Apr. 18, 2013); *Connelly v. Hilton Grant Vacations*

3  *Co., LLC*, 2012 WL 2129364 at *4 (S.D. Cal. June 11, 2012).  Class members will either

4  prevail or lose on this question together.  *Manno v. Healthcare Recovery Group, LLC*, 289

5  F.R.D. 674, 686 (S.D. Fla. 2013) ("Whether the provision of a phone number on admissions

6  paperwork equates to express consent is a question common to all class members, because

7  all class members filled out paperwork at the time of treatment.  On this defense, all class

8  members will prevail or lose together, making this another common issue to the class.").

9        California's Business and Professions Code § 17538.41 is similar to the TCPA.  It

10  prohibits the transmission of a text message advertisement to a cell phone, but it doesn't

11  apply when the sender and recipient have some existing relationship and the recipient "is

12  offered an option not to receive text messages."   Cal. Bus. and Prof. Code

13  § 17538.41(a)(1)–(2)(c).  So, whereas the TCPA requires express consent to receive text

14  messages, California Law requires only that businesses give consumers the option not to be

15  texted.  It's an open question, the Court supposes, whether those are the same thing, that

16  is, whether *not* checking a box that says "Don't text me" is equivalent to expressly consenting

17  to receiving a text.  Van Patten seems to overlook this nuance, because in asserting his

18  § 17538.41 claim he says the texts were made "without the prior express consent of the

19  plaintiff," which speaks more to the TCPA than § 17538.41.  (FAC ¶ 45.)

20        Van Patten's third claim, for a violation of Business and Professions Code § 17200,

21  is really parasitic on his first two.  Section 17200 prohibits business practices that are

22  unlawful, so to the extent Van Patten alleges a violation of the TCPA and § 17538.41, he

23  alleges a violation of § 17200.  But § 17200 also prohibits "unfair" business practices, the

24  meaning of which isn't settled in the caselaw.  *See Dorfman v. Nutramax Labs., Inc.*, 2013

25  WL 5353043 at *13 (S.D. Cal. Sept. 23, 2013).  On the one hand, a business practice is

26  unfair if it violates public policy or is immoral, unethical, oppressive, or unscrupulous and

27  causes injuries to customers that outweigh its benefits.  On the other,  the  unfair practice

28  //

1    must be tethered to some actual or threatened impact on competition.  *Id.*  It's not entirely

2    clear what kind of § 17200 claim Van Patten is asserting.

3    **III. Class Definitions**

4         In his first amended complaint, Van Patten identified both a national and California

5    class, essentially consisting of all people that received one or more unauthorized text

6    message from Vertical Fitness.  (FAC ¶¶ 24–25.)  In his motion for class certification,

7    however, which was filed before his first amended complaint, Van Patten identifies only a

8    national class, defined not in terms of *receiving* an unauthorized text message but in terms

9    of *being sent* one.  That class consists of "[a]ll persons in the United States and its Territories

10   who were sent one or more unauthorized text message advertisements on behalf of

11   Defendant."  (Mot. at 3:17–19.)  Vertical Fitness takes issue with this discrepancy, and

12   believes Van Patten should be held to the class definition in his first amended complaint.

13        There is certainly authority on Vertical Fitness's side.  At least two courts have held,

14   as a hard-and-fast rule, that a plaintiff is limited to the class definition in the operative

15   complaint, and can't offer another one in a motion for class certification.  *See, e.g.*, *Costelo*

16   *v. Chertoff*, 258 F.R.D. 600, 604–05 (C.D. Cal. 2009) ("The Court is bound to class definitions

17   provided in the complaint and, absent an amended complaint, will not consider certification

18   beyond it."); *Berlowitz v. Nob Hill Masonic Mgmt.*, 1996 WL 724776 at *2 (N.D. Cal. Dec. 6,

19   1996) ("[T]he court will not consider certification of the class beyond the definition provided

20   in the complaint unless plaintiffs choose to amend it.").  On the other side, at least one court,

21   when confronted with a discrepancy between the class definition in a complaint and motion

22   for class certification, has simply considered the latter.  *See Pop's Pancakes, Inc. v. NuCO2,*

23   *Inc.*, 251 F.R.D. 677, 680 n.1 (S.D. Fla. 2008).

24        Other courts, however, have looked at the procedural posture of the case and held

25   plaintiffs to the complaint's class definition when the equities require that.  *See, e.g.*, *Ortiz*

26   *v. McNeil-PPC, Inc.*, 2009 WL 1322962 at *3 (S.D. Cal. May 8, 2013) (denying leave to file

27   an amended complaint when a motion for class certification had already been denied and

28   the deadline for amended pleadings had passed); *Jordan v. Paul Financial LLC*, 2009 WL

1   192888 at *6 (N.D. Cal. Jan. 27, 2009) (denying request to withdraw motion for class

2   certification and conduct additional discovery when made in class certification reply brief and

3   at oral argument).  Likewise, some courts have *allowed* a plaintiff to amend a class definition

4   when doing so won't prejudice the defendant in any way.  *See, e.g.*, *In re TFT-LCD (Flat*

5   *Panel) Antitrust Litig.*, 267 F.R.D. 583, 590–91 (N.D. Cal. 2010) (allowing modification of

6   class definition during class certification briefing because "the proposed modifications are

7   minor, require no additional discovery, and cause no prejudice to defendants"); *Stuart v.*

8   *RadioShack Corp.*, 2009 WL 281941 at *3–4 (N.D. Cal. Feb. 5, 2009) (granting motion to file

9   second amended complaint filed after defendant's opposition to class certification when

10  defendant's arguments against class certification wouldn't be affected and no new discovery

11  would be needed).

12       The Court certainly understands Vertical Fitness's frustration here.  In the first place,

13  it's simply sloppy to offer one class definition in a complaint, a different class definition in a

14  subsequent motion for class certification, and essentially the original class definition in a

15  *subsequent* first amended complaint.  At the time the Court granted Van Patten leave to file

16  a first amended complaint, July 18, 2013, his motion for class certification had been pending

17  for almost a month, so there is really no excuse for the incongruous class definitions in each.

18  (*See* Doc. Nos. 23, 27.)  Second, the Court doesn't see that Van Patten even acknowledges

19  in his class certification motion that the class definition differs from that in his complaint, and

20  he's somewhat dismissive of the concern in his class certification reply brief.  At least the

21  plaintiff in *Stuart*, when the defendant pointed out that his motion for class certification

22  contained a different class definition, acknowledged as much and sought leave file an

23  amended complaint.

24       At the same time, the Court struggles to see what the prejudice is to Vertical Fitness

25  in taking the class definition in Van Patten's motion for class certification to be the class

26  definition on the table.  To be sure, Vertical Fitness would rather face a class definition that's

27  easier to oppose, but apart from simply being difficult that's really its only reason for holding

28  Van Patten to his first amended complaint. The proposed class definition was in Van Patten's

original and only motion for class certification, which distinguishes this case from *Ortiz* and *Jones*, and Vertical Fitness's core argument against class certification—namely, that there is a highly individualized question of consent that counsels against class treatment of Van Patten's TCPA claim—still addresses that definition head-on. It has not, in other words, been blind sided. By allowing the class definition in the motion for class certification to be operative, the Court would really only be depriving Van Patten of the additional argument against class certification that it is also a highly individualized question whether members of the putative class received the texts.

The Court will consider the class definition in Van Patten's motion for class certification. It isn't inclined to impose a blanket rule holding Van Patten to his complaint, as in *Costelo* and *Berlowitz*, and when it looks at the circumstances of this case, as in *Ortiz*, *Jordan*, *Flat Panel Litig.*, and *Stuart*, it just doesn't see any prejudice to Vertical Fitness. The operative class definition is therefore as follows: "All persons in the United States and its Territories who were sent one or more unauthorized text message advertisements on behalf of Defendant."

Finally, the Court isn't inclined to certify a sub-class of California residents in this case for a § 17538 or § 17200 claim. There are a number of reasons for this. First, the motion for class certification doesn't ask for that. Second, the motion doesn't even make mention of the California claims; the discussion in Van Patten's moving brief, along with the opposition briefs, focuses entirely on the TCPA. Third, there is likely a threshold numerosity problem for a California sub-class, considering that Vertical Fitness operates gyms in Wisconsin and Minnesota only, does no business in California, and the only reason this case is in the Southern District of California is because Van Patten moved here from Green Bay, Wisconsin. (Baron Decl. at 215:9–216:15.) Fourth, as the Court suggested above, a § 17538 claim differs from a TCPA claim in subtle ways that may require different elements of proof. Frankly, and with all due respect to Van Patten, the Court believes the California

//

//

1  claims were thrown into the complaint and first amended complaint as filler, and if Van Patten

2  isn't going to pursue and take them seriousl,y neither is the Court.  This is therefore strictly

3  a TCPA case.[2]

4  **IV.    Discussion**

5       As the Court reads the opposition brief to class certification, defendants have

6  essentially three arguments.  The first, and the most forceful, is that individual questions of

7  consent proliferate in this case in a way that defeats ascertainability, typicality, commonality,

8  and predominance.  The second is that Van Patten isn't an adequate class representative

9  because he's a *serial* class representative.  The third is that a class action isn't superior to

10 individual lawsuits because it threatens to impose ruinous liability on Vertical Fitness that

11 offends basic notions of due process.

12       **A.    Consent**

13       This is a case in which the orderly, mechanical application of the Rule 23 class

14 certification factors misses a bigger picture that, in the Court's view, is more or less decisive.

15 Vertical Fitness's arguments against ascertainability, typicality, commonality, and

16 predominance are essentially the same, and in the Court's view they fail for the same reason.

17       There is no dispute that Vertical Fitness sent (or had sent) three text blasts to

18 consumers—two to former members like Van Patten and one to present members.  Its core

19 defense to Van Patten's TCPA claim is that those consumers consented to receiving the

20 texts.  They consented, as Vertical Fitness sees it, because they provided their phone

21 numbers on a membership agreement form when they joined the gym.  If they didn't want

22 to receive any texts or phone calls, they would have said so and that would have been noted

23 on their membership agreement.  That is it.  Vertical Fitness doesn't say that class members

24 could have consented to receiving texts in a number of ways, as well as asked not to receive

25

26  [2] This also raises the question whether the Southern District of California is the best
    venue for this case, considering the overwhelming majority of plaintiffs are located closer to
27  where Vertical Fitness operates.  Unfortunately, Vertical Fitness avoids that issue entirely in
    its opposition brief, while Advecor raises it in only a feeble way—in contesting
    superiority—that falls short of asking the Court to transfer this case.  (Advecor Opp'n Br. at
28  18:14–19.)  The Court is willing to consider a motion to transfer venue, but obviously none
    has been filed.

texts in a number of ways.  It takes the position that they all consented by providing their phone numbers, and only withdrew that consent if they asked at that time not to be contacted.  And it is that sole, individualized question—whether the members asked not to be contacted—that Vertical Fitness says defeats class certification in this case.  It makes the class unascertainable, and it deprives the class of commonality, typicality, predominance. Vertical Fitness makes other arguments, too, but this is the argument doing the overwhelming share of the work in its class certification opposition, and doing the work at multiple stops in the Rule 23 analysis:

On ascertainability: "To determine whether a person is a class member here the parties will be required to make individual determinations of whether the contracts reveal some restrictions on the use of the phone numbers provided by new members."  (Opp'n Br. at 9:22–25.)

On commonality: "An individualized inquiry will be required to review the contracts and determine whether each putative class member asserted any limitations when they provided their phone number.  There is no common source of proof as to whether prior express consent was withheld under these circumstances."  (Opp'n Br. at 14:3–7.)

On typicality: "Mr. Van Patten flatly consented to be called at that number.  As such, his claim cannot be typical to the portion of the class that may have received an 'unauthorized' text because it restricted its consent . . . . And the same analysis applies even if Van Patten did not consent to be called; his claim will not be typical of those class members who did consent."  (Opp'n Br. at 17:16–23.)

On predominance: "Simply stated, common questions do not predominate here over individual questions because of the need to evaluate, among other things, the questions of consent on a per-claimant basis."  (Opp'n Br. at 23:26–28.)

Here is the problem, though.  By framing the merits of the case so starkly, Vertical Fitness undermines its very arguments against class certification.   Vertical Fitness's argument on the merits, to be clear, is that gym members consented to receiving the texts at issue if they provided a phone number on their membership agreement.  That's either right

or wrong, as a matter of law.  If it's wrong, liability is in some sense strict and presents virtually no individual issues.  Van Patten will have to show that the texts at issue were actually sent to class members, but that appears to be a rather basic exercise for a telephony forensics expert.  (*See* Snyder Decl. ¶ 8–15.)  It certainly isn't the kind of individualized question that requires a mini-trial and so overwhelms the common questions pertaining to liability that it defeats class certification.  *See Manno v. Healthcare Revenue Recovery Group, LLC*, 289 F.R.D. 674, 686 (S.D. Fla. 2013) ("Whether the provision of a phone number on admissions paperwork equates to express consent is a question common to all class members, because all class members filled out paperwork at the time of treatment.  On this defense, all class members will prevail or lose together, making this another common issue to the class.").

But suppose Vertical Fitness is right, and providing a phone number on the membership agreement *was* consent to receiving promotional texts.  Then, the only individualized question is whether members asked not to be contacted, which Vertical Fitness represents would be noted on the membership agreement itself.  The Court fails to see how that question requires anything other than rifling through a stack of membership agreements—five to ten seconds on each, perhaps—and pulling those that have the relevant notation.  (Vertical Fitness claims that only paper copies are available for membership agreements signed between 2009 and 2011, but nowhere does it claim that it can't access the membership agreements.)  It will take some time, to be sure, but Vertical Fitness's estimate of "thousands of hours" seems grossly exaggerated.  (Opp'n Br. at 23:21–23.)

The point here is simply that whatever the law pertaining to Van Patten's TCPA claim is, Vertical Fitness's defenses are so straightforward, and so uniform across the putative class, that it can't be said that ascertainability, commonality, and typicality are lacking.  Nor can it be said that individual issues predominate over common ones.  The putative class is suing over the same three texts, and Vertical Fitness's defense as to each class member is

//

//

- 10 -

1 identical *and* easily testable: they consented, and if they didn't their membership agreement

2 will say so.[3]  Neither Vertical Fitness nor the Court needs to litigate that simple matter many

3 times over.

4        Vertical Fitness cites a number of cases in its opposition brief in which courts declined

5 to certify TCPA classes.  They are: *Gene and Gene LLC v. Bioplay LLC*, 541 F.3d 318 (5th

6 Cir. 2008); *Gannon v. Network Telephone Servs., Inc.*, 2013 WL 2450199 (C.D Cal. June 5,

7 2013); *G.M. Sign, Inc. v. Brink's Mfg. Co.*, 2011 WL 248511 (N.D. Ill. Jan. 25, 2011);

8 *Versteeg v. Bennett, Deloney & Noyes, P.C.*, 271 F.R.D. 668 (D. Wyo. 2011); *Hicks v. Client*

9 *Servs., Inc.*, 2008 WL 5479111 (S.D. Fla. Dec. 11, 2008); *Levitt v. Fax.com*, 2007 WL

10 3169078 (D. Md. May 25, 2007); *Kenro, Inc. v. Fax Daily, Inc.*, 962 F.Supp. 1162 (S.D. Ind.

11 1997); and *Forman v. Data Transfer*, 164 F.R.D. 400 (E.D. Pa. 1995).  The Court has read

12 each of these cases.  Each one is distinguishable from this case.

13        *Gene and Gene* was an unsolicited fax case, brought under the TCPA.  The

14 defendant's liability, as in this case, came down to a question of consent, which was whether

15 there was an established business relationship between the parties.  The court held, quite

16 sensibly, that *that* question wasn't susceptible to class-wide proof because the fax numbers

17 came from a variety of sources, some of which evidenced a business relationship and some

18 of which did not.  *Gene and Gene*, 541 F.3d at 329.  There is no such individual question in

19 this case.  If Vertical Fitness is right that providing a phone number on a membership

20 agreement constituted consent to receiving the texts, the only individual question is whether

21 the same membership agreement form that all gym members signed contains a simple

22

23 _____

       [3] Advecor makes the argument in its opposition brief that consent is actually a matter
24 of the gym members' individual, subjective understanding of what it meant to provide their
   phone number on a membership application: "[T]o meet Plaintiff's proposed class of people
25 who received an 'unauthorized' text from Vertical will necessarily require the Court to inquire
   as to why each individual Vertical member believes . . . each text they received from Vertical
26 was unauthorized."  (Advecor Opp'n Br. at 16:20–25.)  The Court doesn't see it this way.
   Just because a gym member might consider the texts to be authorized doesn't mean they
27 were authorized; it just means the member is less litigious than Van Patten and takes a
   different view of the law.  When that is the case, a putative class member who may well have
28 a claim is free to opt-out of the class, if it is certified.  But it is certainly no argument against
   class certification that some members of the putative class might consider the case to be
   meritless.  That is true of almost any class action.

notation that they asked not to be contacted.  Screening the forms for that notation is a far easier task than making the determination whether the parties in *Gene and Gene* had an established business relationship.  It is an individual question, to be sure, but it is not one that so overwhelms the common questions of liability that class certification is inappropriate.

*Gannon* involved text messages from a phone sex line, and again liability under the TCPA came down to a question of consent.  The court found the class unascertainable—and that individual questions predominated—because the consent question begged at least five other questions:

> Determining Defendants' liability for the TCPA claim would require individual inquiry into, amongst other things:
>
> (1) whether the class member dialed one of NTS's entertainment lines purposely or on accident;
>
> (2) whether the class member had seen any disclosures of NTS' text message practice in NTS' advertising;
>
> (3) how many times the class member called;
>
> (4) whether the class member heard the disclosure at the beginning of the call during the midamble, advising him about receiving future communications from NTS and advising how to opt-out; or
>
> (5) whether the class member actually attempted to opt-out.
> *Gannon*, 2013 WL 2450199 at *3–4.

That is a veritable matrix of individual questions.  This case, by contrasts, presents just one, and that is assuming Vertical Fitness is right that gym members consented to receiving the texts by providing their phone numbers on a membership agreement.

The next case is *G.M. Sign*, another fax case that is essentially identical to *Gene and Gene*.  Liability came down to a question of consent, which the Court said couldn't be answered by generalized proof because "it would have to determine whether each prospective class member gave consent or had an existing business relationship with Defendant"—determinations that "would most certainly require individualized inquiry."  *G.M. Sign*, 2011 WL 248511 at *10.  For the reasons the Court has given above, the individualized //

12cv1614

1    inquiries required in this case—even assuming Vertical Fitness is right on the legal question
2    of consent—are not nearly so daunting.

3         *Versteeg*, a debt collection case involving a prerecorded phone message, is probably
4    the best so far for Vertical Fitness.  The court held that the plaintiff's TCPA claim "will require
5    extensive individual fact inquiries into whether each individual gave 'express consent' by
6    providing their wireless number to the creditor during the transaction that resulted in the debt
7    owed."  *Versteeg*, 271 F.R.D. at 674.  Still, whereas here that inquiry leads to the same place
8    on the same membership application form, in *Versteeg* it "require[d] an individual review of
9    loan documents and other files related to the underlying debt obligation."  *Id.*  That is no small
10   difference between the two cases.  (It's worth adding here that in each of the cases so far
11   discussed—*Gene and Gene*, *Gannon*, *G.M. Sign*, and *Versteeg*—the courts found the four
12   23(a) factors to be satisfied.  Class certification failed on the predominance inquiry in *Gene*
13   *and Gene*, on ascertainability and predominance in *Gannon*, and on predominance in *G.M.*
14   *Sign* and *Versteeg*.)

15        *Hicks* is essentially the same case as *Versteeg*—a debt collection case in which
16   liability turned on consent.  While the court's discussion is short, it's clear enough that the
17   "mini-trials on consent of every class member" that it envisioned were the sort of paper trail
18   trials envisioned by the court in *Versteeg.  Hicks*, 2008 WL 5479111 at **7–8.  Again, the
19   Court finds that to differ substantially from this case, in which the defendant argues that
20   everyone consented to receiving text messages by signing the same form membership
21   agreement, and to the extent they did not it would be noted in the same place on the same
22   membership agreement.

23        Onto *Levitt*, another fax case.  As in the other fax cases, class certification failed
24   because there was no possible class-wide answer for the question of consent: "This
25   determination of whether invitation or permission was given is, of necessity, highly
26   individualized and would require a separate inquiry for each individual class member in light
27   of their particular relationship or lack of relationship with each of the defendants."  *Levitt*,
28   2007 WL 3169078 at *3.  The Court's position stands.  Assuming Vertical Fitness is right

1   about the significance of members providing their phone numbers on a membership

2   application, the individual questions in the two cases aren't remotely comparable.  The

3   question of an established business relationship probably turns on a number of factors[4],

4   whereas the question of consent in this case turns on just one—and one that is easily

5   determinable.

6        *Kenro* is yet another fax case, and at this point there's no need to go into it.  It is

7   enough to know that the court held that "Kenro's class definition would require the court to

8   conduct individual inquiries with regard to each potential class member in order to determine

9   whether each potential class member had invited or given permission for transmission of the

10   challenged fax advertisements."  *Kenro*, 962 F.Supp. at 1169.

11        Finally, *Forman*, another fax case.  Like the others, the question of consent stood in

12   the way of class certification because it was "inherently individualized, requiring inquiry into

13   the particular circumstances of each transmission.  The transmissions to each plaintiff would

14   necessarily occur in different places, at different times and under differing circumstances."

15   *Forman*, 164 F.R.D. at 404.

16        A case that repeatedly comes up in the above cases, and is distinguished in them

17   because it granted class certification, is instructive here.  It is *Kavu, Inc. v. Omnipak Corp.*,

18   246 F.R.D. 642 (W.D. Wash. 2007).  Kavu is an outdoor apparel company; Omnipak sells

19   packaging material.  Omnipak bought from a third party—Manufacturers' News—a database

20   of companies' contact information, which included Kavu's, and sent those companies the

21   same fax advertisement.  It made all of the difference in the class certification analysis that

22   the same fax was sent exclusively to the companies in the database—companies that, by

23   definition, had no established business relationship with Omnipak.  (In fact, to the extent a

24

---

25        [4] The court in *Levitt* quoted the Code of Federal Regulations for the rule that an
established business relationship is "a prior or existing relationship formed by a voluntary
26   two-way communication . . . with or without an exchange of consideration . . . ."  *See* 47
C.F.R. § 64.1200(f)(3).  Also, "[t]he FCC has opined that the established business
27   relationship exemption is broad and that you have an established business relationship with
a person or entity if you have made an inquiry, application, purchase, or transaction
28   regarding products of services [sic] offered by such person or entity."  *Carnett's Inc. v.
Hammond*, 610 S.E.2d 529, 531–32 (Ga. 2005).

1  very small number coincidentally did, the Court just excluded them from the class.  *Kavu*, 246

2  F.R.D. at 648.)  And indeed, just as Vertical Fitness's chief defense here is that all gym

3  members consented to receiving texts when they provided a phone number, the chief

4  defense in *Kavu* was that companies consented to receiving solicitations when they provided

5  their contact information to Manufacturers' News.  *Id.*  The Court distinguishes the cases

6  relied on by Vertical Fitness from this case in the very same way the court in *Kavu*

7  distinguished it from other TCPA cases in which class certification was denied:

8     Omnipak alleges that it obtained all of the recipients' facsimile
      numbers from the Manufacturers' News database.  Therefore,
9     whether the recipients' inclusion in the Manufacturers' News
      database constitutes express permission to receive
10    advertisements via facsimile is a common issue . . . .  In contrast,
      in the cases relied on by defendant, the issue of whether each
11    potential class member gave permission to receive the facsimiles
      was key.  Those defendants did not, as defendant does here,
12    assert that they received the facsimile numbers and consent to
      receive facsimiles from the recipients' inclusion in a database.
13    *Id.* at 647.

14  On this same logic, because Vertical Fitness alleges that gym members consented to

15  receiving texts simply by providing a phone number when they joined the gym, liability turns

16  on a common question.  (And, as the Court has said, assuming Vertical Fitness is right, the

17  only individual question is the easy-to-verify one of whether a membership application

18  indicates a wish not to be contacted.)  For all of the above reasons, the Court finds that the

19  ascertainability, the 23(a) factors, and the 23(b) factor of predominance are satisfied in this

20  case.

21      **B.    Adequacy**

22      Rule 23(a) requires that the class representatives "will fairly and adequately protect

23  the interests of other members of the class."  *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970,

24  980 (9th Cir. 2011).  To make this determination, the Court has to ask two questions: "(1) do

25  the named plaintiffs and their counsel have any conflicts of interest with other class members

26  and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf

27  of the class?"  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998).  Vertical Fit-

28  //

1   ness and Advecor make, in essence, the same two arguments against a finding of adequacy
2   in this case.

3        The first argument is that Van Patten consented to receiving the texts, and therefore
4   can't represent class members who may not have consented, as evidenced by a notation on
5   their membership agreements.  This goes more to the commonality and typicality of the
6   TCPA claim at issue in this case, which the Court has already addressed.  Van Patten's
7   claim is that he *didn't* consent to receiving the texts just because he provided a phone
8   number on his membership application, and that is also the argument of the putative class.
9   Their interests are therefore adequately aligned.  Van Patten may be wrong as a matter of
10  law—that is a possibility—in which case only those members who specifically asked not to
11  be contacted will have a claim, but that is no reason to believe that his interests are
12  somehow at odds with theirs.

13       The second argument is that Van Patten has been a lead plaintiff in other class
14  actions in southern California (with his same attorneys), and is therefore in this case (as are
15  they) for purely monetary reasons.  As Vertical Fitness puts it, "As a professional plaintiff,
16  there is concern that Mr. Van Patten is not truly representing the interests of the class, and
17  is only interested in maximizing his own payout."  (Opp'n Br. at 19:12–13.)  It's clear that
18  what Vertical Fitness really wants to say, however, is that this is a bogus and petty lawsuit
19  over a trivial or non-injury, in which case it's hard to conceive of *any* lead plaintiff or plaintiff's
20  lawyer it will view approvingly.  That's not an unreasonable view per se—a lot of observers
21  take a very cynical view of class action lawsuits and the plaintiffs and lawyers behind
22  them—but it has nothing to do with the merits of class certification.  The fact is that Congress
23  passed the TCPA and created a claim, and while many recipients of the texts at issue in this
24  case would never think to avail themselves of it and bring a federal lawsuit, Van Patten is
25  perfectly entitled to.  Moreover, he's entitled to bring other lawsuits, too.  *See Murray v.*
26  *GMAC Mortg. Corp.*, 434 F.3d 948, 954 (7th Cir. 2006) ("Nothing about the frequency of
27  Murray's litigation implies that she is less suited to represent others than is a person who
28  received and sued on but a single offer.").

1   The Court sees no conflict of interest here between Van Patten and other members

2   of the class, nor does it see any reason to believe that Van Patten won't prosecute this case

3   vigorously. Already, the history of this case demonstrates that he will.  The Court therefore

4   finds that Van Patten is an adequate class representative.[5]

5        **C.    Superiority**

6   Vertical Fitness offers three arguments against the superiority of class treatment in

7   this case, all related.  The first is that Congress intended for the TCPA to be enforced

8   through individual lawsuits.  The second is that class treatment can't be superior where, as

9   here, full liability would be financially ruinous.  The third, really an extension of the second,

10  is that ruinous liability would violate its right to due process.

11       **1.    Congressional Intent**

12  Vertical Fitness is right that the Senate sponsor of the TCPA, Fritz Hollings, articulated

13  a preference for cases being filed in small claims court, where consumers could appear

14  without an attorney and the damages would be fair to both parties.  *See* 137 Cong. Rec.

15  S16204-01 (1991) ("Small claims court or a similar court would allow the consumer to appear

16  before the court without an attorney.  The amount of damages in this legislation is set to be

17  fair to both the consumer and the telemarketer.").  Likewise, the court in *Forman* recognized

18  that "[a] class action would be inconsistent with the specific and personal injury provided by

19  //

20

21       [5] The Court rejects outright Vertical Fitness's argument that class counsel's
    performance in this case—for example, filing a late motion to amend the complaint—is
22  reason enough to deny them a class counsel appointment.  The Court *granted* the motion
    to file an amended complaint.  Even if Van Patten's counsel has been sloppy at times, the
23  Court wouldn't elevate these to a reason to refuse to appoint them lead counsel in this case.
    It also rejects outright Advecor's argument that Van Patten isn't an adequate class
24  representative because he "has exhibited a disturbing disregard for the truth."  That is a
    completely spurious argument.  Advecor argues that Van Patten is untruthful because he
25  claims he didn't consent to receiving the text messages, when in fact he provided a phone
    number on his membership application.  That's only a contradiction on Advecor's theory of
26  the case and legal construction of "consent" under the TCPA.  If Van Patten said he never
    provided a phone number, and his membership application proved this to be untrue, *then*
27  Advecor might be justified in calling him dishonest.  But he is perfectly entitled to say, in one
    breath, that he provided a phone number, and, in another breath, that he didn't consent to
28  receiving a promotional text.  That doesn't make him a liar; it just means he reads the TCPA
    differently than the defendants do.

12cv1614

Congress to address the minor nuisance of unsolicited facsimile advertisements." *Forman*, 164 F.R.D. at 405.

At the same time, the problematics of reliance on legislative history aside, Senator Hollings most likely spoke of small-scale, individual lawsuits because he envisioned small-scale, individual violations of the TCPA. Certainly, that doesn't eclipse the spirit of Rule 23 that when there is a large number of identical claims arising out of the same course of conduct, the class action mechanism is appropriate for their adjudication. As far as *Forman* is concerned, the court in that case had already decided that commonality, typicality, and predominance weren't satisfied, and so its ruling on superiority must be seen against that backdrop.

In weighing the superiority of a class action compared to individual lawsuits, the Court has to consider: (1) the extent and nature of any pending litigation commenced by or against the class involving the same issues; (2) the interest of individuals within the class in controlling their own litigation; (3) the convenience and desirability of concentrating the litigation in a particular forum; and (4) the manageability of the class action. Fed. R. Civ. P. 23(b)(3)(A)–(D). *Maybe* (3) implicates Congress's professed hope for the enforcement of a statute, but the Court struggles to find the right authority. In the final analysis, faithful to these considerations, the Court has to conclude that a single lawsuit adjudicating the question whether Vertical Fitness's texts violated the TCPA is superior to countless identical and individual lawsuits pressing that same question.

### 2. Financial Ruination

There are three texts at issue in this case—two sent to approximately 30,000 people and one sent to approximately 50,000 people. Assuming each text violated the TCPA, at $500 per violation the math is horrifying for Vertical Fitness. It is looking at a potential damages award of $55 million, which dwarfs its entire net worth of $452,000. This is a mandatory fixed sum, and unlike other consumer protection statutes, for example the FDCPA, there is no cap on the total class recovery. *See J2 Global Commc'ns. v. Blue Jay, Inc.*, 2009 WL 4572726 at *7 (N.D. Cal. Dec. 1, 2009) ("Because [defendant] violated the

TCPA twenty-eight times, [plaintiff] is entitled to at least $14,000."); *Gammon v. GC Servs. Ltd. Partnership*, 162 F.R.D. 313, 316 (N.D. Ill. 1995) ("In the case of a class action under the FDCPA, the named plaintiff may recover statutory damages up to $1,000 for himself; for the class as a whole, damages are capped at $500,000 or 1% of the net worth of the defendant, whichever is less."). Vertical Fitness argues that this potential award cuts against class certification. That argument finds some support in the caselaw.

First, it's clear enough that if Vertical Fitness is stuck with a $55 million judgment, *nobody* will get paid, and that's certainly not in the interests of the putative class. *See Versteeg*, 271 F.R.D. at 674 ("Individual litigants would be more likely to recover under individual actions, rather than proceeding through this action that will not provide them with any relief.").

But beyond that, numerous courts have refused to certify a class simply on the ground that aggregate liability could be ruinous for the defendant disproportionate to the true damage it has done, relying heavily on the Ninth Circuit's opinion in *Kline v. Coldwell, Banker, and Co.*, 508 F.2d 226 (9th Cir. 1974). *See, e.g.*, *In re: Toys "R" Us FACTA Litig.*, 2010 WL 5071073 at * 5–11 (C.D. Cal. Aug. 17, 2010); *Torossian v. Vitamin Shoppe Industries*, 2007 WL 7648594 at *4–5 (C.D. Cal. Aug. 8, 2007); *Legge v. Nextel Commc'ns*, 2004 WL 5235587 at *13–15 (C.D. Cal. June 25, 2004).

The problem for Vertical Fitness is that other courts have gone the other way on this question, essentially saying it's premature to take it up during class certification, and aside from *Kline* the Ninth Circuit hasn't spoken clearly and directly to it. *See Labrador v. Seattle Mortg. Co.*, 2010 WL 3768378 at *7 (N.D. Cal. Sept. 22, 2010); *Tchoboian v. Parking Concepts, Inc.*, 2009 WL 2169883 at *9 (C.D. Cal. July 16, 2009); *Reynoso v. South County Concepts*, 2007 WL 4592119 at *5 (C.D. Cal. Oct. 15, 2007) ("The Court therefore declines to apply the *Kline* rule here. Instead, the Court holds that concerns about the constitutionality of damage awards are better addressed at the damages phase of the litigation and not as part of class certification."); *In re: Napster, Inc. Copyright Litig.*, 2005 WL 1287611 at *10–11 (N.D. Cal. June 1, 2005). Moreover, the most recent on-point authority from the Courts of

1  Appeal takes this side.  *See Murray v. GMAC Mortgage Corp.*, 434 F.3d 948, 954 (7th Cir.
2  2006) ("An award that may be constitutionally excessive may be reduced, but constitutional
3  limits are best applied after a class has been certified.  Then a judge may evaluate the
4  defendant's overall conduct and control its total exposure."); *see also Stillmark v. Weis*
5  *Markets*, 385 Fed.Appx. 267, 276–82 (4th Cir. 2010) (Wilkinson, Judge, concurring)
6  (objecting to majority's refusal to consider magnitude of costs on a defendant company that
7  class certification may impose).

8         Having considered the caselaw above, much of it discussing the issue extensively,
9  and considering how far the class certification analysis has proceeded, the Court is not
10 inclined to deny class certification on the basis of the liability Vertical Fitness faces in this
11 case.  This case has a long way to go; there are cross motions for summary judgment
12 pending, and surviving those, a trial.  If pressed, the Court seriously doubts that Van Patten
13 can or will claim that Vertical Fitness did $55 million worth of damage by sending the texts
14 at issue in this case, and to be frank if such damages are claimed the Court will likely find
15 them to be constitutionally problematic.  *See State Farm Mutual Auto Ins. Co. v. Campbell*,
16 538 U.S. 408, 416 (2003) ("The Due Process Clause of the Fourteenth Amendment prohibits
17 the imposition of grossly excessive or arbitrary punishments on a tortfeasor.").  This is all to
18 say that the Court agrees to postpone any considerations about the damages claimed in this
19 case to a later phase of it.

20 **3.     Due Process**

21        Vertical Fitness argues, finally, and relatedly, that the liability it faces violates its right
22 to due process.  Again, the Court finds this argument to be somewhat premature, and
23 indeed, at least one Court has persuasively rejected it at the class certification stage.  *See*
24 *Kenro*, 962 F.Supp. at 1164–1167.

25 //
26 //
27 //
28 //

**V.    Conclusion**

For all of the reasons given above, Van Patten's motion for class certification is **GRANTED**. The Court further approves his appointment as lead counsel and George Rikos and Nicholas & Butler as class counsel. As always, the Court can decertify a class or modify a class definition "in light of subsequent developments in the litigation." *Gen. Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 160 (1982).[6] The Court will soon turn to the pending cross-motions for summary judgment in this case.

**IT IS SO ORDERED**.

DATED:  November 8, 2013

**HONORABLE LARRY ALAN BURNS**
United States District Judge

---

[6] When it considers summary judgment, the Court will take up one question it acknowledges it hasn't addressed head-on here, which is whether the TCPA has an injury requirement mandating that texts were actually received and that recipients were actually charged for them. Admittedly, this could necessitate the kind of individual inquiries that defeat class certification.

12cv1614