# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRADLEY VAN PATTEN, an individual, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br>vs.<br><br>VERTICAL FITNESS GROUP, LLC, etc.,<br><br>Defendant. | CASE NO. 12cv1614-LAB (MDD)<br><br>**ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT** |

Van Patten accuses Vertical Fitness and Advecor of sending two unsolicited text messages to his cell phone in violation of the federal Telephone Consumer Protection Act and California's Unfair Competition Law. The Court previously certified a class for the TCPA claim. Now pending are cross-motions for summary judgment.

**I.    Factual Allegations**

Van Patten entered a Gold's Gym in Green Bay, Wisconsin on or around March 21, 2009, interested in joining. He filled out an application card, also called a "pre-qualification" or "desk courtesy" card, in which he provided his address and phone number and indicated his reasons for being interested in the gym. This application card was a prelude to a tour

//
//

of the gym and a sit-down with a gym manager, who would then learn more about Van Patten's interest in the gym and explain the various membership options to him. (Van Patten Dep. at 124:11–125:18; Berggren Dep at 47: 21–51:15.) Van Patten decided to join.

Aime Berggren was the gym manager who met Van Patten. She filled out a membership agreement for him to sign, which he did. (Van Patten Dep. at 125:13–126:19; Berggren Dep. at 54:4–18; 61:6–7.) That agreement contained his phone number. Berggren didn't ask Van Patten for his phone number at that time, though; she simply copied it from the application card he had previously filled out. (Berggren Dep. at 86:11–23.)

Berggren didn't ask Van Patten if he had any reservations about being contacted at the telephone number. (Berggren Dep. at 95:5–8.) It wasn't her practice or the gym's to ask that question, or to offer a new member the option of not being contacted. (Berggren Dep. at 95:9–19; 95:25–96:7.) Nor did she explain that the number might be used for marketing purposes. (Berggren Dep. at 69:16–20.) It was her practice to let the member ask not to be contacted, or to place limitations on the use of his phone number, in which case his preference would be noted on the membership agreement. (Berggren Dep. at 95:23–24; 85:14–86:4; 96:14–20; Barton Dep. at 177:3–9.)

It's absolutely clear that Van Patten's phone number appears on the membership agreement without any restrictions. It's also clear enough that just as Berggren didn't ask Van Patten about the use of his phone number, he didn't raise the issue either. (Van Patten Dep. at 107:23–108:10.) It simply never came up, in particular with respect to marketing text messages. (Berggren Dep. at 69:12–15; 70:7–9.)

All of this should be familiar to anyone who has every joined a gym. The potential member walks in, the gym gets some basic information from him, and following a sales pitch he either chooses to join or doesn't. Whether the gym will use the information he provides is not much on his mind. Indeed, by their own admission neither Van Patten nor Berggren have a great memory of the day he joined Gold's. Van Patten remembers "speaking with some representative" and "getting a tour," but he doesn't remember what was said to him

1 or what he said. (Van Patten Dep. at 104:1–105:11; 107:10–14.) Berggren, for her part, doesn't even remember Van Patten personally and doesn't remember her discussions with him. (Berggren Dep. at 42:16–44:23.)

Van Patten wasn't a member of Gold's for very long. He cancelled his membership within a three-day no-cost cancellation window. (Barton Dep. at 129:9–12.) Now, fast forward several years.

The Gold's Gym that Van Patten had joined in Green Bay was a franchise, owned by an LLC. (Barton Dep. at 225:21–226:1; 36:10–37:18.) It is still owned by that LLC today, although in May 2012 the LLC severed the gym's affiliation with Gold's and re-branded it Xperience Fitness. (Barton Dep. at 46:2–13; 48:5–15; 226:6–11; 225:7–11.) Xperience Fitness is a brand owned by the Defendant in this case, Vertical Fitness. Vertical Fitness, to be clear, doesn't have an ownership stake itself in the Green Bay gym; it is just the owner of the brand. (Barton Dep. at 37:13–21.) All that matters here is that the gym Van Patten joined is still in business and still owned by the same people; it just has a different brand affiliation. (Barton Dep. at 46:7–13.) Van Patten says this happened "4 years and 6 months . . . since Mr. Van Patten canceled his Gold's Gym contract," but as the Court does the math the time lapse was approximately 3 years and 1 month (March 21, 2009 to May 2012).

Vertical Fitness engaged Defendant Advecor, a marketing company, to develop a campaign to announce that the gym—as well as other area Gold's Gyms—was becoming an Xperience Fitness gym. (Barton Dep. at 8:7–11.) The goal was mainly to get former members to come back. (Barton Dep. at 17:16–18:6; Advecor Dep. at 25:12–26:16.) The text messages at issue in this case were part of that campaign. (Barton Dep. at 6:16–7:19; 8:13–23; 40:18–21; Advecor Dep. at 31:7–18; 82:9–12.) Now that it's under fire, Vertical Fitness tries to downplay its responsibility for the texts: (1) they were "[o]ne small part of the campaign"; (2) Advecor, not Vertical Fitness, conceived, developed and sent them; and (3) Vertical Fitness didn't even know how many texts were sent. (Doc. No. 43 at 5–6.) Be that as it may, there is no denying that Vertical Fitness authorized and paid for the texts. (Barton Dep. at 8:16–23.)

Van Patten received two text messages sent to former members of the gym. There's no dispute about that. One was sent on May 14, 2012, and another on June 25, 2012. (Van Patten Dep. at 94:16–19; Advecor Dep. at 31:16–34:2; ) (A third text was sent to *current* members, also on June 25.) The texts said essentially the same thing: "Gold's Gym is now Xperience Fitness. Come back today for $9.99/month, no commitment. Enter for a chance to win a Nissan Xterra." (Ellis Decl., Ex. 7.) It went to approximately 30,000 former members. (Doc. No. 47-1 at 5.)

## II.     Legal Standard

Summary judgment is appropriate where "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). It is the burden of the movant—every party in this case, considering there are cross-motions—to show there isn't a genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

The Court considers the record as a whole and draws all reasonable inferences in the light most favorable to the non-moving party. *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 531 (9th Cir. 2000). It may not make credibility determinations or weigh conflicting evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Rather, the Court determines whether the record "presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52. Not all alleged factual disputes will serve to forestall summary judgment; they must be both material and genuine. *Id.* at 247–49. "If conflicting inference may be drawn from the facts, the case must go to the jury." *LaLonde v. County of Riverside*, 204 F.3d 947, 959 (9th Cir. 2000) (citations omitted).

## III.     Discussion

The front-and-center question in this case is whether Van Patten consented to receiving the texts at issue. Consent is the first issue raised by Vertical Fitness and Advecor in their respective motions for summary judgment, and it is the *only* issue raised in Van Patten's motion for partial summary judgment—an attempt on his part to deprive the

defendants of an affirmative defense going into trial. If Van Patten did consent to receiving the texts, this case is essentially over for him and the Court needn't even reach the other issues raised by Vertical Fitness and Advecor. The Court will start with that issue.

### A. Consent

There are three elements to a TCPA claim: "the defendant called a cellular telephone number; (2) using an automatic telephone dialing system; (3) without the recipient's prior express consent." *Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1043 (9th Cir. 2012). The focus here is obviously on the third element, and at least two courts in this District have recognized that whether a TCPA plaintiff actually gave express prior consent is an affirmative defense to be raised and proven by a defendant. *See Robbins v. Coca-Cola Co.*, 2013 WL 2252646 at *2 (S.D. Cal. May 22, 2013); *Connelly v. Hilton Grand Vacations Co., LLC*, 2012 WL 2129364 at *3 (S.D. Cal. June 11, 2012). *See also Grant v. Capital Mgmt. Servs., L.P.*, 449 Fed.Appx. 598, 600 n.1 (9th Cir. 2011).

There is no dispute here that Van Patten never actually said to Vertical Fitness, "Yes, you may text me at the number I have given you," or anything like that. He never signed his name or initialed next to a disclaimer that by providing his phone number to Vertical Fitness he was welcoming text messages. As the Court said above, when Van Patten joined the Gold's Gym, the subject of text messages never came up. (Berggren Dep. at 69:12–15; 70:7–9.) Van Patten simply provided his phone number on an application card with no discussion of why Gold's Gym needed it or what they would do with it. (Van Patten Dep. at 124:13–22.) But according to Vertical Fitness, no discussion was required. The mere act of Van Patten writing down his phone number on an application card was all the consent it needed.

Vertical Fitness relies, first, on various FCC interpretations of the TCPA, beginning with one in 1992 that said "persons who knowingly release their phone numbers have in effect given their invitation or permission to be called at the number which they have given, absent instructions to the contrary." *In re Rules & Reg's Implementing the Tel. Consumer Prot. Act of 1991*, 7 F.C.C.R. 8752, 8769 (Oct. 16, 1992). Subsequently in 2008, in the

context of debt collection calls, the FCC concluded that "the provision of a cell phone number to a creditor, *e.g.,* as part of a credit application, reasonably evidences prior express consent by the cell phone subscriber to be contacted at that number regarding the debt." *In re Rules & Reg's Implementing the Tel. Consumer Prot. Act of 1991*, 23 F.C.C.R. 559, 564 (Jan. 4, 2008). The FCC did change course in 2012, concluding that "requiring prior express written consent for telemarketing calls utilizing autodialed or prerecorded technologies will further reduce the opportunities for telemarketers to place unwanted or unexpected calls to consumers," but this interpretation of the TCPA was prospective, commencing twelve months after "publication of OMB approval of our written consent rules in the Federal Register." *In re Rules & Reg's Implementing the Tel. Consumer Prot. Act of 1991*, 27 F.C.C.R. 1830, 1839, 1856–67 (Feb. 15 2012). It took effect on October 16, 2013, well after the texts at issue in this case were second. (Ellis Decl., Ex. 13.) These FCC Orders clearly cut against Van Patten.

Vertical Fitness relies, second, on various cases that cite these FCC interpretations in dismissing claims brought under the TCPA. And there are a lot of those cases, some even decided while the motions for summary judgment have been under submission. The Court will discuss them individually.

In *Pinkard v. Wal-Mart*, the first case, the plaintiff alleged a TCPA violation when she filled a prescription at Wal-Mart's pharmacy, provided her phone number, and subsequently received texts from the store. 2012 WL 5511039 at *2 (N.D. Ala. Nov. 9, 2012). As in this case, the store didn't get the plaintiff's explicit permission to send her text messages (and their substance may have not even been related to her prescription); she was simply automatically enrolled into a texting program in virtue of providing her phone number at the point of sale. Nonetheless, relying on the 1992 FCC Order, the court held that the plaintiff consented to receiving the texts and had no claim under the TCPA: "'Prior express consent' to receive a call is given when the 'called party' voluntarily proffers her telephone number to the calling party. By her complaint's own admission, plaintiff provided her telephone number to defendant at defendant's request." *Id.* at *6.

*Emanuel v. Los Angeles Lakers, Inc.* also cuts against Van Patten. 2013 WL 1719035 (C.D. Cal. Apr. 18, 2013). The plaintiff in *Emanuel* had attended a Lakers game and, at the invitation of the team displayed on the large monitor in the arena, texted a message that he hoped would be displayed on that monitor. He immediately received a confirmation text saying, among other things, "Thnx! Txt as many times as u like. Not all msgs go on screen." *Id.* at *1. He later sued, claiming that the confirmation text violated the TCPA. The court disagreed, again relying in part on the 1992 FCC Order, along with the context of the plaintiff's text and the response text. It noted that "many federal courts have concluded that when a customer provides a company his or her phone number in connection with a transaction, he or she consents to receiving calls about that transaction," setting up the conclusion that "because Plaintiff voluntarily provided his number to the Lakers in requesting that his personal message appear on the Staples Center jumbotron . . . he consented to receiving a confirmatory text from the Lakers." *Id.* at 3–4.

The same reasoning appears in *Roberts v. PayPal, Inc.*, in which a plaintiff added his phone number to his PayPal account, immediately received a confirmation text, and then filed a TCPA action. 2013 WL 2384242 (N.D. Cal. May 30, 2013). The court followed *Pinkard*, holding that by merely providing his number to PayPal the plaintiff consented to received the text at issue. *Id.* at 4–5. *Pinkard*, *Emanuel*, and *Roberts* are the cases Vertical Fitness relies upon in its own summary judgment brief. Subsequent cases were decided in a way that's also favorable to Vertical Fitness after the Court took the summary judgment motions under submission.

The first of those cases, *Murphy v. DCI Biologicals Orlando, LLC*, is right on point here. 2013 WL 6865772 (M.D. Fla. Dec. 31, 2013). The plaintiff in *Murphy* was a former blood donor. He had been paid to give blood at a plasma collection center, and he had willingly provided his phone number as part of his medical and biographical background. *Id.* at *1. This was in March through June of 2010. *Id.* at *2. Over two years later, in August of 2012, the plasma collection center sent him texts asking him to return, and offering him a financial bonus for doing so. Considering itself bound by the 1992 FCC Order, the court

found that "Murray's provision to the Defendants of his cellular phone number constituted his express consent to the Defendants to call him at that number." *Id.* at *5. In fact, the plaintiff provided his phone number on a "New Donor Information Sheet" that was likely quite similar to the application card on which Van Patten provided his phone number when he joined Gold's Gym.

Another court considered itself bound by the 1992 FCC Order in *Baird v. Sabre Inc.*, a case involving a plaintiff who booked a flight on the Hawaiian Airlines website, provided her phone number, and then received a text from a contractor company asking if she wished to receive flight notifications by text. 2014 WL 320205 (C.D. Cal. Jan. 28, 2014). Finding for the defendant, the court said that "[u]nder the FCC's definition, it is undisputed that Baird 'knowingly release[d]' her cellphone number to Hawaiian airlines when she booked her tickets, and by doing so gave permission to be called at that number by an automated dialing machine." *Id.* at *6.

The next case, *Kolinek v. Walgreen Co.*, involved a time lapse between the provision of a phone number and the allegedly infringing texts that was almost a decade—longer than the lapse in *Murphy* and the lapse in this case. 2014 WL 518174 (N.D. Ill. Feb. 10, 2014). The plaintiff filled a prescription at Walgreen's, provided his cell phone number for identity verification purposes, and over ten years later he began receiving "robocalls" reminding him to refill his prescription. *Id.* at *1. Once again, the court found that the 1992 FCC Order governed and that the plaintiff's admission that he gave Walgreen's his phone number was fatal to his TCPA claim. *Id.* at *2.

In *Steinhoff v. Star Media Co., LLC*, the court applied the 1992 FCC Order and the 2008 FCC Order to conclude that a plaintiff who provided her phone number when she signed up for a one-year newspaper subscription had no TCPA claim arising out of attempts the newspaper made about a past-due balance and renewal when the subscription ended. 2014 WL 1207804 (D. Minn. Mar. 24, 2014). *Id.* at *2–3. It also reasoned that the mere end of the subscription didn't terminate the consent that came with providing the phone number in the beginning, especially absent any affirmative act to revoke the consent. *Id.* at *4.

The last case the Court will mention—though far from the last case available—is *Andersen v. Harris & Harris*. 2014 WL 1600575 (E.D. Wisc. Apr. 21, 2014). The plaintiff in this case provided his phone number to a utility company in order to open an account and receive power at various meters. This was in December 2003. *Id.* at *3. Years later, after he stopped paying his account, the utility company hired a collection agency, and the agency placed numerous calls to the number that were only met with a voicemail message warning of a potential TCPA violation. *Id.* at *3. Relying on the 1992 and 2008 FCC Orders, the Court had no doubt that "under the FCC guidance and myriad cases . . . Mr. Anderson consented to be called on his cell phone number . . . ." *Id.* at *9.

Collectively, all of these cases amount to a flurry of punches that has Van Patten on the ropes, and his attempt to right himself is unpersuasive. In no particular order, Van Patten counters: they aren't binding precedent if they're not from within the Ninth Circuit; they're factually distinguishable; the Court needn't defer to the FCC, which is wrong anyway; the only true "prior express consent" is consent that is affirmatively stated and recorded, as opposed to passively providing a phone number; other cases are on its side; and even if Van Patten did give consent, he gave it to Gold's not to Vertical Fitness and he withdrew it when he cancelled his membership.

First, with respect to the force of the FCC Orders, Vertical Fitness has identified, by the Court's count, at least seven cases that examine and follow them—some from within the Ninth Circuit and some from outside of it. Van Patten has identified just one case that goes the other way, *Lusskin v. Seminole Comedy, Inc.*, 2013 WL 3147339 (S.D. Fla. June 19, 2013). In *Lusskin*, the Court referred to the dictionary and common usage definitions of "prior express consent" over the 1992 FCC Order, finding that "[s]ince Seminole Comedy's prior-express-consent argument is predicated solely on the 1992 FCC Order, the argument necessarily fails because the 1992 FCC Order deviates from the plain language of the statute on the express-consent issue." *Id.* at *3. With all due respect to the *Lusskin* court, this Court is inclined to follow the many other cases that treat the FCC Orders as binding. Indeed, one Judge in the Northern District of California who initially questioned the validity

of the FCC's Orders subsequently vacated her opinion to acknowledge that she lacked the authority to do so. *See Leckler v. Cashcall, Inc.*, 2008 WL 5000528 at *3 (N.D. Cal. Nov. 21, 2008) ("The federal courts of appeals had exclusive jurisdiction over plaintiffs' challenge to the FCC's declaratory ruling.") (vacating *Leckler v. Cashcall*, 554 F.Supp.2d 1025 (N.D. Cal. 2008)). Under the Administrative Orders Review Act, 28 U.S.C. § 2342(1), only the Courts of Appeals have the authority to invalidate them. *Murphy*, 2013 WL 6865772 at *5–8.

Second, two cases from within this district that Van Patten cites, *In re Jiffy Lube Int'l, Inc. Text Spam Litig.* and *Connelly v. Hilton*, aren't as helpful as he needs them to be. *Connelly*, which predates all of the cases discussed above, ruled on a motion to dismiss with little evidentiary record. 2012 WL 2129364 at *4. It even passed on the question whether providing a phone number on a Hilton Honors application sufficed as "prior express consent" to be called because there was no evidence that the plaintiffs had actually submitted such an application. *Id*. It did refuse to conclude that "one who provides a contact telephone number in booking a hotel reservation is 'clearly and unmistakably' consenting to receive promotional calls," but the factual record of the case hadn't been developed and the FCC's Orders received no mention. *Id*. Likewise, *Jiffy Lube*, which also predates all of the above cases, was a ruling on a motion to dismiss that didn't even consider the evidentiary basis of the alleged consent; it made the mere passing remark that "even if [the Court] were to take judicial notice of the invoices, it is not persuaded that a customer's provision of a telephone number on the invoice would constitute prior express consent." 847 F.Supp.2d 1253, 1259 n.7. With all due respect, the *Jiffy Lube* and *Connelly* decisions can't stand up to the far more robust analyses in the cases that followed and that the Court has discussed above.

Third, Van Patten relies too heavily on *Satterfield v. Simon & Schuster.* It's true that the Ninth Circuit held in *Satterfield* that express consent is "consent that is clearly and unmistakably stated." 569 F.3d 946, 955 (9th Cir. 2009). But the context of the consent discussion in that case was whether consent to be contacted by one company's "affiliates and brands" constituted consent to be contacted by a totally unrelated company. The plaintiff signed up for promotions from a ringtone company, Nextones.com, and then

received a text from a publishing company promoting Stephen King's latest book. *Id.* at 949. The Ninth Circuit didn't cite the 1992 FCC Order's interpretation of "express consent," even though it did defer to the Order's interpretation of a "call" under the TCPA, and it held that "Satterfield's consent to receive promotional material by Nextones and its affiliates and brands cannot be read as consenting to the receipt of Simon & Schuster's promotional material." *Id.* at 955.

But *Satterfield* has less traction where, as in this case, the party being sued is essentially the very party to whom the phone number was given—Van Patten's argument that Vertical Fitness and Gold's Gym are separate companies notwithstanding. *See Pinkard*, 2012 WL 5511039 at *5; *Roberts*, 2013 WL 2384242 at *4 ("The *Satterfield* plaintiff provided her cell phone number to Nextones in order to receive a free ringtone, and then received a text message from a completely different company (Simon & Schuster) regarding a completely different subject (a Stephen King novel)."); *Baird*, 2014 WL 320205 at *3 ("While the court mentioned the dictionary definition of 'express consent' in support of the conclusion that a person's consent to receive calls from one business does not constitute consent to receive calls from a different business, the issue of whether the mere act of providing a cellphone number constitutes 'express consent' did not arise in *Satterfield*."). Even if the Court made much of the fact in *Satterfield* that the plaintiff didn't just provide her number, but actually checked "Yes!" next to a box offering promotional messages, this still wouldn't get Van Patten around the 1992 FCC Order, which "the Ninth Circuit had no power to reject . . . in the course of an appeal from a judgment denying a TCPA claim." *Baird*, 2014 WL 320205 at *4.

Fourth, Van Patten exaggerates the significance of the factual details of this case that he believes distinguish it from the above cases and cut in his favor. The argument that any consent given to Gold's Gym didn't transfer to Vertical Fitness is a non-starter. The very deposition testimony Van Patten cites confirms that Vertical Fitness is simply a different brand name on the very same gym with the very same ownership. (Barton Dep. at 46:7–13.) There is no evidence to support Van Patten's characterization of it as a "third-party

promoter." (Doc. No. 47-1 at 14.) The time lapse of four years is also insignificant because "consent under the TCPA does not expire on its own; it must be revoked." *Kolinek*, 2014 WL 518174 at *3. Finally, the Court doesn't agree that mere membership cancellation is tantamount to the revocation of consent, as Van Patten argues. The Third Circuit did hold that the TCPA allows consumers to revoke their prior express consent, and without any temporal limitation, but the plaintiff in the case had actually written to the defendant listing her phone number and asking the defendant to stop calling it. *Gager v. Dell Fin. Servs., LLC*, 727 F.3d 265, 267, 271 (3d Cir. 2013). This allowed for the application of the torts principle, which Van Patten cites, that "consent is terminated when the actor knows or has reason to know that the other is no longer willing for him to continue the particular conduct." *Id.* at 271 (quoting Restatement (Second) of Torts § 892A, cmt. I (1979)). *See also Osorno v. State Farm Bank, F.S.B.*, 2014 WL 1258023 at *10–11 (11th Cir. 2014); *Beal v. Wyndham Vacation Resorts, Inc.*, 956 F.Supp.2d 962, 977 (W.D. Wis. June 20, 2013) ("This unwillingness may be manifested to the actor by any words or conduct inconsistent with continued consent . . . .") (quoting Restatement (Second) of Torts § 892A, cmt. I (1979)).

Here, however, it doesn't follow from Van Patten's mere cancellation of his gym membership that he no longer wished to be contacted by the gym, or that Vertical Fitness should have understood this. The court in *Steinhoff* found that the expiration of a newspaper subscription didn't constitute an "affirmative act of revocation," 2014 WL 1207804 at *4, and in *Anderson* the plaintiff's voice recording asserting his rights under the TCPA was held to not give the defendant proper notice of a revocation. 2014 WL 1600575 at *10. Against the backdrop of these cases, the Court is not persuaded that by merely cancelling his membership, Van Patten revoked his prior express consent to be contacted.

Fifth, the text Vertical Fitness sent related to the original reason Van Patten provided his number: gym membership. And it is this very characteristic of a text that insulates it from a claim under the TCPA. As the court put it in *Emanuel*, "the fact that the confirmatory text included information relevant to Plaintiff's request demonstrates—in part—why the message challenged here is not the kind of intrusive, nuisance telemarketing call that Congress sought

to prohibit in enacting the TCPA." 2013 WL 1719035 at *3 (internal quotations and citation omitted). *See also Roberts*, 2013 WL 2384242 at *4 (dismissing TCPA claim where "the content of the complained-about text message is closely related to the circumstances under which plaintiff provided his cell phone number").

For all of the above reasons, the Court finds that summary judgment is appropriate for Vertical Fitness on its affirmative defense that Van Patten consented to receiving the texts at issue when he provided his phone number upon joining the gym. The Court is bound by the 1992 FCC Order interpreting "prior express consent," and the caselaw from this and other districts is unquestionably on the side of Vertical Fitness. *See, e.g.*, *Murphy*, 2013 WL 6865772 at *6–8. Defendants' motion for summary judgment on the TCPA claim is therefore **GRANTED**.

**B.   State Claims**

In addition to a TCPA claim, Van Patten asserts a claim under California's equivalent, Cal. Bus. and Prof. Code § 17538.41. He also asserts a claim under § 17200 of the Business and Professions Code.

When the Court certified the class in this case, it noted that a TCPA claim differs subtly from a § 17538.41 claim, at least as far as their respective statutes read, and that Van Patten's complaint isn't sensitive to their differences. (Doc. No. 54 at 4.) In asserting his § 17538.41 claim, for example, he calls the texts "unsolicited" and made "without prior consent," characterizations that really only implicate the TCPA. (FAC ¶ 45.) Under § 17538.41 there is no "prior express consent" requirement, only an exception to liability if a company gives consumers an option to not receive the texts. The Court even declined to certify a sub-class of California residents for this reason, among others. It said, "Frankly, and with all due respect to Van Patten, the Court believes the California claims were thrown into the complaint and first amended complaint as filler, and if Van Patten isn't going to pursue and take them seriously, neither is the Court." (Doc. NO. 54 at 7.) *Still*, the Court finds the California claims to be under-developed and under-argued, but they remain on the table (for Van Patten only) and the Court must address them.

Section 17538.41 applies only to entities conducting business in California. Vertical Fitness argues that it doesn't conduct business in California, and that's that. It doesn't even rely on the exceptions to § 17538.41 that the Court addressed in its class certification order, for example the exception that arises when the consumer is given an option not to receive text messages. It simply argues, "Here, there are absolutely no facts that show Vertical Fitness conducts any business, intentionally or otherwise, in California. Rather, the undisputed facts demonstrate that Vertical Fitness conducts business only in Wisconsin and Minnesota, as its gyms are only located in those two states." (Doc. No. 43 at 18–19.) The Court agrees with that.

Van Patten offers five facts to support a finding that Vertical Fitness does business in California: (1) Van Patten lives here, and Vertical Fitness texted him; (2) Vertical Fitness texted others with California phone numbers; (3) Vertical Fitness offers online and mobile health applications that are available to anyone, anywhere; (4) Advecor is based in San Diego, CA; and (5) Vertical Fitness aims to expand the "Xperience Fitness" brand nationally. (Doc. No. 50 at 21–22.) The Court finds these alleged connections to California lacking, individually and collectively. The fact is that Vertical Fitness operates regional gyms in Wisconsin and Minnesota; that's where its business is. The texts were targeted at people in those states, and to the extent some weren't it was simply because, like Van Patten, they moved—most likely without Vertical Fitness knowing. (Barton Dep. at 16:16–19; 215:9–216:15; Advecor Dep. at 249:7–251:3.) Many of those with California phone numbers may well be Wisconsin or Minnesota residents, anyway. Its website is accessible anywhere, sure, but if that's no basis for personal jurisdiction, which it isn't, the Court has a very hard time accepting that it's a basis for a § 17538.41 claim. *See Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F.Supp.2d 1194, 1124 (W.D. Pa. 1997). The fact that Advecor is based here is not significant. Notwithstanding the dispute about who's actually responsible for the texts, the commercial relationship that exists in California between Advecor and Vertical Fitness still only serves a business interest in Wisconsin and Minnesota. The fact that Advecor is based here is no more significant than if the supplier of Vertical Fitness's sanitary products

for its gym bathrooms were based here. Finally, a press release that Vertical Fitness issued did say, "Vertical Fitness Group plans to own and operate health clubs on a national basis under the Xperience Fitness brand," but this is an aspirational footnote in a two-page document that overwhelmingly confirms the regional limits of Vertical Fitness's business. It is based in Appleton, WI, it operates 11 gyms in Wisconsin and Minnesota, and it is taking over four more gyms in the Milwaukee area. (*See* Tomasevich Decl., Ex. 11.) The Court finds no basis for the conclusion that Vertical Fitness does business in California, and for this reason finds that Defendants are entitled to summary judgment on Van Patten's claim under § 17538.41. Their summary judgment motion is **GRANTED**.

The last question is whether Van Patten has a § 17200 claim. The statute prohibits "unlawful, unfair, or fraudulent" acts, and each "prong" provides a "separate and distinct theory of liability." *Rubio v. Capital One Bank*, 613 F.3d 1195, 1203 (9th Cir. 2010). Van Patten's complaint pursues the first two; he alleges that the texts were unlawful and unfair. (FAC ¶ 49.) Obviously, a claim of unlawful conduct under § 17200 has to fail, considering the Court's above rulings on Van Patten's TCPA and § 17538.41 claims. *See Renick v. Dun & Bradstreet Receivable Mgmt. Servs.*, 290 F.3d 1055, 1058 (9th Cir. 2002). That leaves a claim of unfair business practices.

As the Court noted when it certified the class in this case, the meaning of "unfair" under § 17200 isn't exactly settled: "On the one hand, a business practice is unfair if it violates public policy or is immoral, unethical, oppressive, or unscrupulous and causes injuries to customers that outweigh its benefits. On the other, the unfair practice must be tethered to some actual or threatened impact on competition." (Doc. No. 54 at 4.) "The 'proper definition of 'unfair' conduct against consumers is 'currently in flux' among California courts,' and some appellate opinions have applied a more stringent test, particularly for conduct that threatens an incipient violation of antitrust law." *Plumlee v. Pfizer, Inc.*, 2014 WL 695024 at *6 n.3 (N.D. Cal. Feb. 21, 2014) (quoting *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1169 (9th Cir. 2012)). Van Patten concedes that the meaning of "unfair" isn't

//

settled in the caselaw, and he proceeds to cite three cases that attempt to define it and then fit Vertical Fitness's texts to those definitions. (Doc. No. 50 at 22–24.)

Assuming that the "unfair" practices claim doesn't fail for the same reason that the "unlawful" practices claim does—*Dun & Bradstreet* suggests that where a 17200 claim hinges on a rejected federal claim the § 17200 claim fails on *all prongs*—Vertical Fitness argues that Van Patten can't allege an injury, anyway, because he wasn't charged individually for the texts at issue under his unlimited texting plan. (Van Patten Dep. at 70:4–25.) Standing to bring a claim under § 17200, for the purposes of this case, is limited to a person "who has suffered injury in fact and has lost money or property as a result of the unfair competition." Cal. Bus. & Prof. Code. § 17204. The California Supreme Court has recognized that these two prongs—"injury in fact" and "lost property or money"—will often overlap, as they seem to in this case. *Kwikset Corp. v. Superior Court*, 51 Cal.4th 310, 323 (Cal. 2011) Van Patten admitted in his deposition that the texts caused him no emotional distress, and to the extent they made him angry it was only because he sensed they were a violation of the law, not, for example, because they violated his own sense of privacy norms. (Van Patten Dep. at 60:15–61:1.) His own brief even concedes that he believes his injury is at core an economic one. (Doc. No. 50 at 24–25.) When this overlap is present—when the injury in fact *is* the loss of money—a plaintiff must "demonstrate some form of economic injury," which is "substantially narrower than federal standing under Article III." *Kwikset*, 51 Cal.4th at 323–24. Moreover, the economic injury must be "nontrivial": "If a party has alleged or proven a personal, individualized loss of money or property in any nontrivial amount, he or she has also alleged or proven injury in fact." *Id.* at 325.

Against this background, the Court finds no injury here that is cognizable under § 17200. The fact is that Van Patten wasn't charged for the texts except in the formal sense that he pays for unlimited texting, and the Court can't reconcile liability for that nominal amount with the holding of *Kwikset*. This shouldn't come as a surprise to Van Patten. To support the argument that "by paying for an unlimited texting service [he] still suffers an economic injury as a result of Defendants' conduct," Van Patten cites three TCPA cases, two

of which deal with the injury-in-fact requirement for Article III standing. Those cases are no help at all to his assertion that he has suffered a cognizable injury under California's Unfair Competition Law. Defendants' summary motion as to Van Patten's § 17200 claim is therefore **GRANTED**.

## V.    Conclusion

To summarize, the Court finds, first, that because Van Patten willingly gave his phone number to Gold's Gym when he became a member he consented to being texted by a re-branded gym about a membership offer. The binding FTC interpretations of the TCPA, as well as the caselaw, compel this conclusion. Second, the Court finds that Vertical Fitness doesn't conduct business in California in a manner that exposes it to liability under § 17538.41. Vertical Fitness operates several gyms in two states in the Midwest. The Court finds, finally, that Van Patten's § 17200 claim fails, either because his previous two claims fail *or* because he hasn't suffered an adequate "injury in fact" under § 17204. Van Patten's motion for partial summary judgment is **DENIED**, and the Defendants' motions for summary judgment are **GRANTED**.

**IT IS SO ORDERED**.

DATED:

*[signature: Larry A. Burns]*

**HONORABLE LARRY ALAN BURNS**
United States District Judge